UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| DARCY AARON HARPER, | **1:17-cv-00606-DAD-GSA-PC** |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS DR. HTAY AND DR. RAMOS'S MOTION FOR SUMMARY JUDGMENT BE GRANTED** |
| v. | **(ECF No. 39.)** |
| DR. RAMOS, et al., | |
| Defendants. | **OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS** |

## I.  BACKGROUND

Darcy Aaron Harper ("Plaintiff") is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983.  This case now proceeds against defendants Dr. Htay, Dr. Ramos, and Dr. Varanasi for providing inadequate medical care in violation of the Eighth Amendment.[1]

On February 10, 2021, defendants Dr. Htay and Dr. Ramos ("Defendants") filed a motion for summary judgment.  (ECF No. 39.)  On May 12, 2021, Plaintiff filed an opposition to the motion.[2]  (ECF No. 45.)  On May 19, 2021, Defendants filed a reply to the opposition.  (ECF No. 46.)  Pursuant to Local Rule 230(*l*), this motion is now before the court.

---

[1] On October 31, 2019, the court issued an order dismissing all other claims and defendants from this action, based on Plaintiff's failure to state a claim.  (ECF No. 16.)

[2] Together with the motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion for summary judgment.  Woods v. Carey,

For the reasons set forth below, the court recommends that the court grant summary judgment to Defendants Dr. Htay and Dr. Ramos.

## II.    SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, he only needs to prove an absence of evidence to support Plaintiff's case.  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendant meets his initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." Id.  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all

---

684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).  (ECF No. 39-7.)

inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The court determines only whether there is a genuine issue for trial. <u>Thomas v. Ponder</u>, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In arriving at these findings and recommendations, the court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this court did not consider the argument, document, paper, or objection. This court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## III. PLAINTIFF'S ALLEGATIONS -- SECOND AMENDED COMPLAINT[3]

Plaintiff is presently incarcerated at the California Health Care Facility in Stockton, California. The events at issue in the Second Amended Complaint allegedly occurred when Plaintiff was incarcerated at Wasco State Prison (WSP) in Wasco, California. Plaintiff's allegations follow:

Plaintiff was sentenced to 16 years to life in Fresno County. Nurse Vivian [not a defendant] at Fresno County Jail emailed WSP Medical and asked them if they could accommodate an inmate who needed peritoneal dialysis. WSP Medical advised her that they could take care of that. When Plaintiff arrived at WSP they took all of the dialysis medicine that was sent with him. WSP could not let Plaintiff do dialysis at the prison and sent him out to Mercy Hospital in Bakersfield for dialysis about twice a week. WSP Medical later decided not to send Plaintiff out for dialysis anymore. Dr. Ramos told Plaintiff that Dr. Varanasi had a meeting instructing medical staff not to send Plaintiff out for dialysis anymore. This resulted in cardiac

---

[3] Plaintiff's Second Amended Complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence. <u>Jones v. Blanas</u>, 393 F.3d 918, 922-23 (9th Cir. 2004). The summarization of Plaintiff's claim in this section should not be viewed by the parties as a ruling that the allegations are admissible. The court will address, to the extent necessary, the admissibility of Plaintiff's evidence in the sections which follow.

arrest after 7 days. Plaintiff went into a coma, had blood blisters all over his body, ruptured his pancreas and lost oxygen to his brain. Dr. Ramos refused Plaintiff access to medical care in July 2014 after being instructed not to provide medical care by Dr. Varanasi. Dr. Ramos told Plaintiff that Dr. Varanasi told him not to give Plaintiff dialysis. Dr. Htay, B-yard doctor at WSP, refused Plaintiff dialysis for 7 days in July 2014.  R.N. Blocher [not a defendant] lied to Dr. Varanasi concerning how Plaintiff was responding to hemodialysis.  Dr. Varanasi had a meeting in July 2014 at WSP where he instructed all medical staff not to send Plaintiff out for dialysis and to just let him die. In July 2014, R.N. Wee [not a defendant] did nothing to get Plaintiff life-saving medical attention. Plaintiff seeks monetary damages and an apology from Dr. Varanasi. He also wants the court to prosecute Dr. Varanasi.

## IV.    PLAINTIFF'S MEDICAL CLAIM – LEGAL STANDARD

The Civil Rights Act under which this action was filed provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

"[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 618 (1979); Hall v. City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012); Crowley v. Nevada, 678 F.3d 730, 734 (9th Cir. 2012); Anderson v. Warner, 451 F.3d 1063, 1067 (9th Cir. 2006).  "To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress."  Id.

To state a claim under § 1983, a plaintiff must allege that (1) the defendant acted under color of state law and (2) the defendant deprived him or her of rights secured by the Constitution or federal law.  Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006); see also

Marsh v. Cnty. of San Diego, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" Preschooler II v. Clark Cnty. Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." Preschooler II, 479 F.3d 1183 (quoting Johnson, 588 F.2d at 743). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." Arnold v. Int'l Bus. Mach. Corp., 637 F.2d 1350, 1355 (9th Cir. 1981); see also Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical

///

5

needs. <u>McGuckin</u> at 1060 (citing <u>Shapely v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" <u>Id.</u> at 1057 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" <u>Id.</u> (quoting <u>Gibson v. County of Washoe, Nevada</u>, 290 F.3d 1175, 1188 (9th Cir. 2002)). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." <u>Id.</u> at 1060. "[E]ven gross negligence is insufficient to establish a constitutional violation." <u>Id.</u> (citing <u>Wood v. Housewright</u>, 900 F.2d 1332, 1334 (9th Cir. 1990)).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." <u>Franklin v. Oregon</u>, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted). To prevail, a plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

## V.   DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS[4]

Defendants Dr. Htay and Dr. Ramos submitted this statement of undisputed material facts in support of their motion for summary judgment. (ECF No. 29-2.)

///

---

[4] Plaintiff failed to properly address Defendants' statement of undisputed facts, as required by Local Rule 260(b). Accordingly, the court may consider Defendants' assertions of fact as undisputed for purposes of this motion. <u>Id</u>; Fed. R. Civ. P. 56(e)(2). However, in light of the Ninth Circuit's directive that a document filed *pro se* is "to be liberally construed," <u>Estelle v. Gamble</u>, 429 U.S. 97, 106, 97 S.Ct. 285, 292, and Rule 8(e) of the Federal Rules of Civil Procedure provides that "[p]leadings shall be construed so as to do justice," <u>see</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007), the court shall strive to resolve this motion for summary judgment on the merits.

1.      At all relevant times, Defendants Ramos and Htay were board-certified physicians employed as physicians by the California Department of Corrections and Rehabilitation (CDCR). (Decl. Ex. 1, Pl. Dep. Tr. 36:12-14; Ramos Decl. ¶ 2; Htay Decl. ¶ 2.)

2.      At all relevant times, Plaintiff Harper was a prisoner in the custody of CDCR. (Smith Decl. Ex. 1 at 28:1-14.)

3.      At all relevant times, Plaintiff Harper was housed at Wasco State Prison (WSP). (Smith Decl. Ex. 1 at 46:9-13; 27:17-24; 28:1-9.)

4.      Plaintiff has not studied medicine, or nursing. (Smith Decl. Ex. 1, 22:15-23.)

5.      Plaintiff suffers from kidney failure, and has undergone dialysis for several years. (Ramos Decl. ¶ 10; Ramos Decl. Ex. 1 at 1; Smith Decl. Ex. 1 at 37:15-17, 38:16-22; Feinberg Decl. ¶ 13; Feinberg Ex. 2 at 1-3.)

6.      Before he was incarcerated, Plaintiff had utilized peritoneal dialysis and hemodialysis. (Smith Decl. Ex. 1, 55:14-56:18.)

7.      At the relevant time, CDCR inmates were not permitted to self-dialyze with peritoneal dialysis; the prison offered hemodialysis for inmates who required dialysis. (Ramos Decl. ¶¶ 9-10, Feinberg Decl. ¶ 9.)

8.      Hemodialysis is a process by which a dialysis machine, and a filter called a dialyzer, clean the blood. Using a dialyzer requires access to the blood vessels, which is usually obtained via a surgery and may be referred to as a shunt (an implanted tube to which an artery and vein are attached), or arteriovenous fistula (an abnormal connection between an artery and vein that creates a higher blood flow, so a larger amount of blood can pass through the dialyzer). Peritoneal dialysis is typically performed by surgically placing a catheter in a patient's abdomen, which is used to allow sterile cleansing fluid into the body and then allow the cleansing fluid to leave the body. (Feinberg Decl. ¶ 8.)

9.      Peritoneal dialysis carries a higher risk of infection, is less efficient, and has to be done more frequently than hemodialysis. (Feinberg Decl. ¶ 9; Ramos Decl. ¶ 9.)

///

///

10.     Plaintiff arrived at Wasco State Prison in 2014, and was seen by Dr. Ramos shortly after his arrival. (Feinberg Decl. ¶ 14; Feinberg Ex. 2 at 1-3; Smith Decl. Ex. 1 at 46:9-13; Ramos Decl. ¶ 8; Ramos Decl. Ex. 1 at 1, 5.)

11.     Before his cardiac incident in July 2014, Plaintiff told Dr. Ramos he wanted his equipment to self-dialyze in his cell, using peritoneal dialysis, or to be sent out for dialysis. (Smith Decl. Ex. 1 at 56:2-22, 65:24-66:11.)

12.     At his first consultation with Plaintiff on June 17, 2014, Dr. Ramos sent Plaintiff to Mercy Hospital to receive peritoneal dialysis and be evaluated for his capacity to receive hemodialysis in the future. (Feinberg Decl. ¶ 14; Feinberg Ex. 2 at 1-3, 6-8, 9-11, 13, 14-18; Ramos Decl. ¶ 10; Ramos Dec. Ex. 1 at 1-3, 5.)

13.     Plaintiff was repeatedly sent out for peritoneal dialysis at Mercy Hospital from the time he arrived at the prison to the time he allegedly had a cardiac incident in July 2014. (Feinberg Decl. ¶¶ 14, 18-19, 22; 23; Ramos Decl. ¶¶ 12-14; Smith Decl. Ex. 1 at 68:2-11.)

14.     When Plaintiff was initially sent out for an evaluation at Mercy Hospital to determine if he could undergo hemodialysis, Plaintiff was apprehensive, and did not consent to the evaluation. (Ramos Decl. ¶ 11; Feinberg Decl. ¶ 15; Feinberg Decl. Ex. 2 at 14-15.)

15.     On June 18, 2014, vascular surgeon Dr. Soto of Mercy Hospital opined that Plaintiff's arm could and should be accessed for hemodialysis, but Plaintiff refused to cooperate. (Feinberg Decl. ¶ 16; Feinberg Ex. 2 at 16.)

16.     On June 20, 2014, Plaintiff refused hemodialysis, despite knowing that CDCR did not offer peritoneal dialysis. (Feinberg Decl. ¶ 17; Feinberg Decl. Ex. 2 at 17-18.)

17.     On June 23, 2014, Plaintiff went back to Mercy Hospital for more peritoneal dialysis. (Feinberg Decl. ¶¶ 18- 19; Feinberg Decl. Ex. 2 at 2.)

18.     On June 23, 2014, Plaintiff was still refusing any evaluation for arteriovenous fistula access for hemodialysis. (Feinberg Decl. ¶ 17; Feinberg Ex. 2 at 2-4.)

19.     Plaintiff went back to the hospital on June 30 with uremic symptoms to receive peritoneal dialysis. (Feinberg Decl. Ex. 2 at 51.)

///

20. Plaintiff went back to the hospital on July 8 with uremic symptoms, after Dr. Ramos saw him in the TTA and sent him out for peritoneal dialysis. (Feinberg Decl. ¶ 22; Feinberg Decl. Ex. 2 at 24-26.)

21. From the time he arrived at WSP to the time of the cardiac incident in July 2014, Plaintiff did not regularly see or talk to Dr. Htay. (Smith Decl. Ex. 1 at 72:15- 73:11, 74:7-75:5.)

22. Plaintiff does not recall seeing or talking to Dr. Htay before the time of the cardiac incident in July 2014. (Smith Decl. Ex. 1 at 72:15- 73:11, 74:7-75:5)

23. At no time did Plaintiff ask Dr. Htay for dialysis and Dr. Htay fail to respond to Plaintiff's needs. (Smith Decl. Ex. 1 at 92:3-8.)

24. There was no medical reason that Plaintiff needed to undergo peritoneal dialysis, as opposed to hemodialysis, but Defendants could not force Plaintiff to accept hemodialysis or undergo the treatment necessary to be medically evaluated and cleared for it. (Ramos Decl. ¶ 16; Feinberg Decl. ¶ 27.)

25. At all times, Dr. Ramos provided Plaintiff with medically appropriate treatment. (Feinberg Decl. ¶ 28, 30.)

26. At all times, Dr. Htay provided Plaintiff with medically appropriate treatment. (Feinberg Decl. ¶ 29, 30.)

27. Plaintiff did not consent to hemodialysis until early August 2014. (Feinberg Decl. Ex. 2 at 41-43.)

28. Dr. Ahmed of Mercy Hospital noted on August 10 that Plaintiff was commenting that hemodialysis was not good dialysis for him. The doctor further noted that Plaintiff's comments that hemodialysis was not good dialysis for him were a "presumption," because Plaintiff's creatinine levels had decreased and his symptoms had improved with hemodialysis. (Feinberg Decl. Ex. 2 at 39-40.)

29. Dr. Htay was serving as an on-call physician when Plaintiff was discharged from inpatient peritoneal dialysis at Mercy Hospital on June 21, 2014; a nurse called Dr. Htay to advise of Plaintiff's discharge and describe Plaintiff's condition. Dr. Htay reviewed the information

///

from the nurse about Plaintiff's status, determined there was no emergency and no medical care required, and did not see Plaintiff personally. (Htay Decl. ¶ 8.)

30.     Dr. Htay was serving as an on-call physician when Plaintiff was discharged from inpatient peritoneal dialysis at Mercy Hospital on July 4, 2014; a nurse called Dr. Htay to advise of Plaintiff's discharge and describe Plaintiff's condition. Dr. Htay reviewed the information from the nurse about Plaintiff's status, determined there was no emergency and no medical care required, and did not see Plaintiff personally. (Htay Decl. ¶ 9.)

31.     Dr. Htay did not consult Plaintiff again until August 2014, which was after the times relevant to Plaintiff's allegations. (Htay Decl. ¶ 10; Htay Decl. Ex. 1 at 5.)

## VI.     DEFENDANT RAMOS'S ARGUMENTS

### A.     <u>Defendant Ramos Provided Plaintiff With Appropriate Treatment For His Kidney Disease At All Relevant Times.</u>

Defendant argues that Defendant Dr. Ramos was not deliberately indifferent to Plaintiff's medical needs.

#### 1.     <u>Dr. Ramos Provided Plaintiff with Constitutionally Sufficient Care</u>

Defendants' expert, Dr. Feinberg, found Dr. Ramos's care medically appropriate from June 17, 2014, when Plaintiff arrived at WSP, until July 8, 2014, when Plaintiff went into cardiac arrest.

> "Based on my education, training, and experience, and review of Plaintiff's medical records, it is my opinion that Dr. Ramos provided medically appropriate care, within the standard of care, for Mr. Harper's condition, by sending him out to a facility for peritoneal dialysis when Mr. Harper refused hemodialysis at the prison and began to show symptoms of uremia from June 2014 to the time of Plaintiff's cardiac incident in July 2014."

(Feinberg Decl., ECF No. 39-4 ¶ 28.)

Dr. Feinberg also found it reasonable for Dr. Ramos to rely on the opinions of Dr. Varanasi and the vascular surgeon in determining whether Plaintiff could use hemodialysis.

///

"[Plaintiff] was evaluated by nephrologist Dr. Varanasi (a kidney specialist) four days after being sent to WSP, who suggested they continue him on peritoneal dialysis while a vascular surgeon ensured his arteriovenous fistula could be used for hemodialysis. It was reasonable, and within the standard of care, for Defendants Drs. Ramos and Htay to rely on these medical specialist opinions in determining whether Plaintiff could be dialyzed using hemodialysis."

(Feinberg Decl., ECF No. 39-4 ¶ 30.)

When Plaintiff first arrived at WSP, he saw Dr. Ramos.

"I consulted with Mr. Harper on June 17, 2014 after he had arrived at the prison from the county jail."

(Ramos Decl. ECF No. 39-5 ¶ 10.)

Plaintiff's medical records show that Dr. Ramos made a written request on June 17, 2014, for Plaintiff to be sent to Mercy Hospital for continuation of his peritoneal dialysis and an attempt to reestablish his hemodialysis access. (ECF Nos. 39-4 at 25, 39-5 at 11.)[5] He met with doctors there who recommended hemodialysis, but Plaintiff refused it. (ECF No. 39-4 at 27-29.) Dr. Feinberg, expert witness, testified that he "found no support in the records for the proposition that the only medically appropriate dialysis for Plaintiff was peritoneal dialysis," and "[d]octors could not force Plaintiff to accept hemodialysis." (Feinberg Decl. ECF No. 39-4 ¶ 27.) Records show that during a subsequent trip to the hospital, Plaintiff refused to be accessed for hemodialysis. (ECF No. 39-4 at 14-16), and that Plaintiff was willing to take a risk to stay on peritoneal dialysis despite [WSP] being unable to give adequate peritoneal dialysis, (Feinberg Decl. ¶¶ 16-17; ECF No. 39-4 at 29).

CDCR offered hemodialysis, but not peritoneal dialysis, to inmates who needed dialysis. (Ramos Decl., ECF No. 39-5 ¶ 11; Feinberg Decl., ECF No. 39-4 ¶ 9.)

///

---

[5] All page numbers cited herein are those assigned by the court's CM/ECF system and not based on the parties' pagination of their briefing materials.

So whenever Plaintiff's condition appeared to require dialysis, Dr. Ramos or other treating staff would send Plaintiff out to Mercy Hospital for peritoneal dialysis. (Feinberg Decl., 39-4 ¶¶ 18-19, 22; 23; Ramos Decl., 39-5 ¶¶ 13-14.)

Plaintiff testified at his deposition taken on October 29, 2020:

> Q    Okay.  And I think you had told us earlier that Dr. Ramos had you sent out to the hospital; right?

> A    Uh-huh, yes.

> Q    Okay.· And how often -- if you remember, how often did he have you sent out to the hospital from the time you arrived at Wasco State Prison to the time you had the heart attack and coma that you described?

> A    I can remember two times.· That's what I can remember, but I'm not saying that that's the only times I went because I just don't remember.

(Pltf's Depo., Smith Decl. Ex. 1, ECF No. 39-3 at 40:2-11.)

Dr. Ramos testified:

> "Because Wasco State Prison did not and does not do peritoneal dialysis for inmates, I requested authorization [on June 17, 2014] of temporary removal for medical treatment for Mr. Harper for an initial consultation, so he could receive peritoneal dialysis while it was determined whether hemodialysis access was appropriate and available."

(Ramos Decl., ECF No. 39-5 ¶ 13.)

Defendants' expert, Dr. Feinberg, opined that Dr. Ramos provided Plaintiff treatment when he required it and worked to provide Plaintiff appropriate dialysis, even though Plaintiff refused hemodialysis until early August 2014. (Feinberg Decl. Exhs., ECF 39-4 at 51, 53.)

Defendant argues that Plaintiff's desire to demand the type of dialysis that he desired, rather than accept the type that was prescribed and appropriate for him did not amount to deliberate indifference and rather, it represented a disagreement between Plaintiff – the patient – and his doctor, which is not an Eighth Amendment violation.  Sanchez v. Vild, 891 F.2d 240,

///

241 (9th Cir. 1989). Indeed, each time Dr. Ramos encountered Plaintiff he provided Plaintiff with treatment and responded to his medical needs.

According to medical expert Dr. Feinberg's review of Plaintiff's medical treatment, the care Dr. Ramos provided was at all times appropriate:

> "Further, my review of the records show that Dr. Ramos repeatedly requested that Plaintiff be sent out to a hospital for peritoneal dialysis between Plaintiff's arrival at WSP in June 2014, and the cardiac incident in July 2014. Dr. Ramos repeatedly requested Plaintiff be taken out for peritoneal dialysis on medically appropriate occasions, when Plaintiff required treatment because he refused to accept the medically appropriate hemodialysis that was available to him at the prison. Based on my education, training, and experience, and review of Plaintiff's medical records, it is my opinion that Dr. Ramos provided medically appropriate care, within the standard of care, for Mr. Harper's condition, by sending him out to a facility for peritoneal dialysis when Mr. Harper refused hemodialysis at the prison and began to show symptoms of uremia from June 2014 to the time of Plaintiff's cardiac incident in July 2014."

(Feinberg Decl., ECF No. 39-4 at 8 ¶ 28.)

Finally, Defendant argues that Plaintiff's own refusal to accept the prescribed treatment is not deliberate indifference. See Cromer v. Songer, 1:15-cv-01742-SAB (PC), 2016 WL 492652 *4 (E.D. Cal. Feb. 9, 2016) (inmate's desire for peritoneal dialysis instead of hemodialysis did not raise a deliberate indifference claim). Defendants conclude that Defendant Ramos should be granted judgment.

## VII. DEFENDANT HTAY'S ARGUMENTS

### A. Defendant Htay Provided Plaintiff With Appropriate Treatment For His Kidney Disease At All Relevant Times.

Defendants argue that Defendants Dr. Htay was not deliberately indifferent to Plaintiff's medical needs.

///

**<u>Defendant Htay Provided Plaintiff with Constitutionally Sufficient Care.</u>**

Defendant Htay had very little contact or involvement with Plaintiff's treatment during the relevant time period. Indeed, Defendant Htay did not even have occasion to provide Plaintiff with face-to-face treatment until after the relevant time alleged in Plaintiff's complaint.

"I did not personally see Mr. Harper until August 19, 2014, at which time I consulted him with a licensed vocational nurse. This was several weeks after his cardiac incident that is the subject of his Complaint. The August 19, 2014 encounter was a follow-up appointment after Plaintiff was admitted to the hospital with fluid overload. I noted that he was in end stage renal disease and is on hemodialysis, and should continue hemodialysis. I noted that he is using a wheelchair and should exercise more. Plaintiff was noted as having hemodialysis the day before and did not complain of shortness of breath. During a review of systems, I did not note any abnormalities."

(Htay Decl. ECF No. 39-6 ¶ 10, & Exh. 1 at 10.)

Dr. Htay's only contact with Plaintiff during the relevant timeframe between June and July 2014, was on 2 occasions, on June 21, 2014 and July 4, 2014, when he worked as an after-hours on-call physician and Mercy Hospital discharged Plaintiff from the hospital following peritoneal dialysis treatment. On both occasions, Dr. Htay received information from a prison nurse about Plaintiff's hospitalization and his condition on discharge, and determined no additional treatment or care was needed at the time:

"I was not Mr. Harper's primary care physician in June or July 2014. According to my review of the relevant medical records in June and July 2014, I was an on-call physician when Mr. Harper was discharged from the hospital on June 21, 2014. Because I was on call, the Triage and Treatment Area (TTA) nurse called me to advise me that Mr. Harper was discharged from the hospital and had been received at the prison. As the on-call physician, I would consult with nurses at the prison for anyone who required medical care, or who was discharged from a hospital, after normal business hours. In the instance of a patient who had been

discharged from the hospital the nurse would explain the patient's diagnosis on arrival at the hospital and any conditions upon discharge, advise the on-call physician of any recommendations or prescriptions, and document the arrival of the patient for the on-call physician's review the next day. If a situation was an emergency, the on-call physician would come in, but many non-emergent situations were consulted over the phone. In Mr. Harper's case, he was being discharged from the hospital following peritoneal dialysis treatment. I did not personally see Mr. Harper, as I determined from the phone consultation that there was no emergency. The nurse explained the reason for hospitalization and his state upon discharge and arrival back at the prison, and advised that he was stable. I determined there was no additional treatment required at that time. There was no additional medical care that would need to be provided to Mr. Harper at that appointment. I reviewed the notes from the discharge. A true and correct copy of the notes are attached as Exhibit A.[6]

(Htay Decl., ECF No. 39-6 at 2-3 ¶¶ 8-9, Exh. 1, ECF No. 39-6 at 7-9.)

"I also found a note from July 4, 2014. Similarly, I was on call that night and received a phone call from the nurse concerning Mr. Harper who had been discharged from the hospital for inpatient peritoneal dialysis after his admission. The nurse explained the reason for hospitalization, his status on discharge, and advised that he was stable. I determined there was no additional medical treatment or care required at that time, and because this was a nonemergency situation, I did not personally see Mr. Harper. There was no additional medical care that would need to be provided to Mr. Harper at that appointment. I reviewed the notes from the discharge. A true and correct copy of the notes are attached as Exhibit [1].

(Htay Decl., ECF No. 39-6 at 3 ¶ 9, Exh. 1, ECF No. 39-6 at 6.)[7]

---

[6] There is no Exhibit A attached to Dr. Htay's declaration. However, there is an Exhibit 1 with notes dated June 21, 2014 that appear applicable, at pages Med-02, Med-03, Med-04 (ECF No 39-6 at 7-9).

[7] Htay's declaration contains two paragraphs #9, one on ECF No. 39-6 at pp. 2-3, one at p. 3.

Plaintiff testified at his deposition about his contact with Dr. Htay between his arrival at WSP and the time of the alleged cardiac incident:

Q    Was there an occasion where you told him to his face that you needed to be sent out for dialysis and he didn't do it?

A    No.

Q    Okay.

A    I don't think so.

(Pltf's Depo, ECF No. 39-3 at 45:3-8.)

Q    Okay. And how often would you see Dr. Htay when you went to B yard in the time period we are talking about between your arrival at Wasco State Prison and the time you had the heart attack and coma you described?

A    I think it must have been about -- you know what, I don't remember if I had ever seen him before or not. I think -- I'm not sure. But I think I only seen him after that. No. I've seen him before that. I had to have, but I seen him a lot after that.

Q    When you say, "after that," are you talking about the heart attack and coma?

A    Yeah. Because I was in a coma so long that when I came out, I had a bowel that was so big, it tore my behind of trying to come out, then I had to go to him to get treated for hemorrhoids after that.

Q    So as best you can, I want to talk about the time before the heart attack and coma where you would see Dr. Htay. It sounds like you don't remember how often you would see him.

A    I don't remember a lot of things that happened before that.

(Pltf's Depo., ECF No. 39-3 at 41:15- 42:11.)

Q    What did you want Htay to do to treat you·medically in the time we're talking about between your arrival at Wasco State Prison and the time you went out on the heart attack and coma that you told us about?

A    That was really not too much before that. I just needed dialysis. And it was his responsibility to get me off of that yard and up to emergency and into dialysis.  And he just refused to do it.  And the time before the heart attack, just they would leave me there until I was

almost comatose, and then some CO would come and say, Hey, this guy is sick. And they would take me up to the front and somebody sent me out. Dr. Htay didn't send me out. And I would send the nurses over there 20 times to tell that man to try to send me out to dialysis and they would come back and say we told him. That's all. We told him.

Q    Well, you seem to remember talking to nurses during that time period. Did you talk to Dr. Htay?

A    I said, no.

Q    Okay. Were you seen by Dr. Htay?

A    No. I don't think so. I just remember him mostly after I came back.

(Pltf's Depo, ECF No. 39-3 at 43:7-44:5.)

Defendants argue that Dr. Htay was not deliberately indifferent to Plaintiff, and Defendants' expert, Dr. Feinberg, opined that at all relevant times, Dr. Htay provided medically appropriate treatment to Plaintiff:

> "Additionally, based on my education, training, experience, and review of Plaintiff's medical records, I have concluded that the care Dr. Htay provided to Plaintiff met the standard of care for Plaintiff's condition in June and July 2014. Dr. Htay had limited contact with Plaintiff. The TTA note from July 4, 2014, showed that Plaintiff was discharged from Mercy Hospital status post hyperkalemia and consulted by Dr. Htay in his on-call physician capacity. According to notes, Plaintiff refused hemodialysis, but refused to admit he was refusing, complaining that 'it just doesn't work.' Nothing in the discharge records indicate other actions by Dr. Htay were necessary that day. I also found notes from June 21, 2014, showing that Dr. Htay was the on-call physician who was consulted when Plaintiff returned from receiving peritoneal dialysis at Mercy hospital. I also found a further note from August 10, 2014, showing that Dr. Htay was notified that Plaintiff was complaining of vomiting and shortness of breath. Dr. Htay ordered Plaintiff to be sent out for peritoneal dialysis at another facility.

///

Based on my review, nothing about Dr. Htay's evaluations or treatment at the time was medically inappropriate."

(Feinberg Decl., ECF No. 39-4 ¶ 29.)

"According to my review of Plaintiff's relevant records, Plaintiff was hesitant about accepting hemodialysis instead of peritoneal dialysis, but there does not seem to be a medical basis for Plaintiff's refusal to accept hemodialysis. He was evaluated by nephrologist Dr. Varanasi (a kidney specialist) four days after being sent to WSP, who suggested they continue him on peritoneal dialysis while a vascular surgeon ensured his arteriovenous fistula could be used for hemodialysis. It was reasonable, and within the standard of care, for Defendants Dr. Ramos and Htay to rely on these medical specialist opinions in determining whether Plaintiff could be dialyzed using hemodialysis. Moreover, when the surgeon evaluated Plaintiff's arteriovenous fistula, Plaintiff refused to allow it to be used for hemodialysis. The doctors could not force Plaintiff to accept hemodialysis. It appears to me from a review of the records that from mid-June to approximately July 8, Plaintiff would insist on peritoneal dialysis, which was not available at WSP, refuse hemodialysis, and wait till he showed uremia symptoms, at which point a physician – including Dr. Ramos on several occasions – would request to send Plaintiff out for peritoneal dialysis at a facility that could provide it. It also appears to me that in his minimal involvement with Plaintiff's care between June and August 2014, Defendant Dr. Htay provided medically appropriate care to Plaintiff. These doctors provided reasonable and appropriate medical treatment within the standard of care for Plaintiff's condition at the times they treated him."

(Feinberg Decl., ECF No. 39-4 ¶ 30.)

Defendants conclude that the Court should grant summary judgment to Defendant Htay.

///

///

# VIII. DEFENDANTS RAMOS AND HTAY HAVE MET THEIR BURDEN

Based on Defendants Dr. Ramos and Dr. Htay's arguments and evidence, the court finds that these Defendants have met their burden of demonstrating that Plaintiff has no evidence that they acted with deliberate indifference in violation of the Eighth Amendment when providing Plaintiff with medical care. Therefore, the burden now shifts to Plaintiff to produce evidence of a genuine material fact in dispute that would affect the final determination in this case.

# IX. PLAINTIFF'S OPPOSITION

In opposition, Plaintiff argues that the inadequate medical care he received from Defendants Dr. Ramos and Dr. Htay resulted in his heart attack, coma, and other harm to his health on July 8, 2014. Plaintiff alleges the following in his opposition, which is unverified. (ECF No. 45.):

Plaintiff was left in his cell 8 days without dialysis.

No one should go for more than 2 days without dialysis.

There is a pattern of violation of the rights of African Americans.

Dr. Varanasi says [interrogatories] that Dr. Ramos suspended his medical care.

Plaintiff denies that other health conditions contributed to his heart attack.

Defendants refused to help Plaintiff because he is Black and in prison.

Plaintiff's allegations in his Second Amended Complaint constitute evidence where they are based on his personal knowledge of facts admissible in evidence. Jones, 393 F.3d at 922-23. (ECF No. 11.) Plaintiff's alleges in the verified Second Amended Complaint:

"While I was at WSP [Wasco State Prison] I was refused lifegiving medical care. I needed peritoneal dialysis every day and I was refused [it] for seven days." (ECF No. 11 at 5.)

"I got sentenced to 16 yrs to life at Fresno County. County Nurse Vivian at Fresno County Jail e-mailed WSP Medical and asked them if they could accommodate an inmate who needed peritoneal dialysis. WSP Medical advised her that they could take care of that. When I got to WSP, they took all of my dialysis medicine that was sent to WSP with me. They WSP couldn't let me do

dialysis at the prison WSP. They WSP were sending me out to Mercy Hospital in Bakersfield for dialysis about 2 times a week. WSP Medical decided not to send me out for dialysis any more. Dr. Ramos told me that Dr. Varanasi had a meeting instructing medical staff not to send me/Darcy Harper out for dialysis any more. This resulted in cardiac arrest. After 7 days I went into a coma, had blood blisters all over my body, ruptured my pancreas [and] lost oxygen to my brain."

(ECF No. 11 at 5, 4.)[8]

"Dr. Ramos refused me access to medical care in July of 2014 after being instructed not to do so by Dr. Varanasi. Dr. Ramos told me that Dr. Varanasi told him not to give me dialysis. Dr. Htay B-yard doctor at WSP refused me dialysis for 7 days in July 2014."

(ECF No. 11 at 3.)

"Dr. Varanasi had a meeting in July 2014 at WSP where he (Dr. Varanasi) instructed all staff concerning me/Darcy Harper not to send me out for dialysis and just let me die."

(ECF No. 11 at 3.)

## X. DISCUSSION

The only claims at issue in this motion are Plaintiff's claims against defendants Dr. Ramos and Dr. Htay for inadequate medical care in violation of the Eighth Amendment. Plaintiff also alleges in his opposition that Defendants refused to help him because he is Black. However, there is no claim at issue that Plaintiff was treated differently because he is Black.

**PLAINTIFF'S EIGHTH AMENDMENT MEDICAL CLAIM**

Defendants have characterized Plaintiff's medical claim as a difference of opinion with his doctors as to whether he should use peritoneal dialysis or hemodialysis, concluding that such a difference of opinion does not constitute a claim for deliberate indifference. However, after reviewing Plaintiff's allegations, the court finds that Plaintiff's primary concern is that he was

---

[8] The pages of the Second Amended Complaint appear to be out of order. (ECF No. 11.)

not given *any* dialysis during the days before he suffered cardiac arrest. Plaintiff argues that neither Dr. Ramos nor Dr. Htay had him transported to the hospital for dialysis before he was so sick that he suffered cardiac arrest. Plaintiff claims that Defendants' deliberate indifference to his serious medical need caused him to suffer cardiac arrest and other harms to his health.

### 1.  Serious Medical Need

There is no dispute in this case that Plaintiff suffered from a "serious medical need." Defendants Ramos and Htay do not contest that Plaintiff suffered from renal disease and required dialysis.

### 2.  Deliberate Indifference

However, Plaintiff has not met his burden to present evidence showing that either of the Defendants, Dr. Ramos or Dr. Htay, were deliberately indifferent in response to Plaintiff's medical need.

### A.  Dr. Ramos

Plaintiff bases his deliberate indifference claim on a conversation he allegedly had with Dr. Ramos who told Plaintiff that Dr. Varanasi had a meeting and told medical staff not to take Plaintiff to dialysis anymore and to leave Plaintiff in his cell and let him die. (ECF No. 34-4 at 8:9-21.) Plaintiff was not at the meeting, (Id. at 8:15-16), and has no other evidence to support his contention that the meeting was held or what happened at the meeting. This evidence is inadmissible because Plaintiff did not testify about what he personally experienced, and therefore, Plaintiff's account of Dr. Ramos' statement about the meeting is inadmissible hearsay.

Plaintiff's claim that Dr. Ramos treated him with deliberate indifference is not supported by factual allegations or other evidence. Plaintiff testifies that Dr. Ramos failed to "send me out on time to go to the hospital and get dialyzed, or give me my equipment so I could dialyze myself." However, Plaintiff fails to allege facts demonstrating that Dr. Ramos knew that Plaintiff was at substantial risk of serious harm and yet deliberately ignored the risk or otherwise acted unreasonably in the face of such risk.

Defendants' evidence shows that Dr. Ramos was not Plaintiff's primary care physician in June or July 2014, and Defendants' expert, Dr. Feinberg, opined that Dr. Ramos provided

Plaintiff treatment when he required it and worked to provide Plaintiff appropriate dialysis, even though Plaintiff refused hemodialysis until early August 2014.

Given this testimony, no reasonable jury could find that Defendant Ramos acted with the type of deliberate indifference that satisfies the legal standard of Plaintiff's Eighth Amendment Claim. As such, summary judgment in Defendant Ramos's favor is appropriate.

### B. Dr. Htay

Plaintiff declares that "Dr. Htay B-yard doctor at WSP refused me dialysis for 7 days in July 2014," (ECF No. 11 at 3), but he has not supported this statement with admissible evidence.

Here, as with his claim against Dr. Ramos, Plaintiff bases his deliberate indifference claim on a conversation he allegedly had with Dr. Ramos who told Plaintiff that Dr. Varanasi had a meeting and told medical staff not to take Plaintiff to dialysis anymore and to leave Plaintiff in his cell and let him die. Plaintiff was not at the meeting and has no other evidence to support his contention that the meeting was held, or what happened at the meeting. Plaintiff's statements about the meeting are inadmissible hearsay.

Defendants' evidence shows that Dr. Htay consulted on Plaintiff's case twice, and on both occasions was an on-call physician when Plaintiff was being re-admitted to CDCR from the hospital. After reviewing the medical records Defendants' expert witness determined that Dr. Htay provided medically appropriate care, within the standard of care, at all relevant times, for Plaintiff's condition.

Given this testimony, no reasonable jury could find that Defendant Htay acted with the type of deliberate indifference that satisfies the legal standard of Plaintiff's Eighth Amendment Claim. As such, summary judgment in Defendant Htay's favor is appropriate.

### C. Causation

Moreover, Plaintiff also fails to establish that anything Dr. Ramos or Dr. Htay did or failed to do caused Plaintiff harm. Plaintiff is not competent to provide medical opinion evidence sufficient to create any triable issue of fact in this case. See (affidavit or declaration used to oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated).

Plaintiff has presented no evidence that either of the Defendants' conduct in response to Plaintiff's medical need fell below the medical standard of care so significantly that it could constitute deliberate indifference under the Eighth Amendment, or that either of the Defendants acted unreasonably in response to the knowledge that Plaintiff faced a substantial risk of serious harm, causing Plaintiff harm. Rather, Plaintiff's causation arguments rely entirely on his non-medical opinion. Plaintiff's opinion testimony is not admissible under Rule of Evidence 701 because he is a layman and not a medical expert:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> **(a)** rationally based on the witness's perception;
>
> **(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> **(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

Accordingly, based on the foregoing, the court should grant Defendants Dr. Ramos and Dr. Htay's motion for summary judgment on Plaintiff's § 1983 claim of deliberate indifference in violation of the Eighth Amendment.

## XI.     CONCLUSION AND RECOMMENDATIONS

The court finds and shall recommend that based on the undisputed facts, Defendants Dr. Ramos and Dr. Htay's motion for summary judgment, filed on February 10, 2021, should be granted. In light of this recommendation, the court declines to consider Defendants' qualified immunity argument.

Therefore, based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The motion for summary judgment filed by Defendants Dr. Ramos and Dr. Htay on February 10, 2021, be GRANTED as to Plaintiff's § 1983 claims against them under the Eighth Amendment;

2.      Summary judgment be granted to Defendants Dr. Ramos and Dr. Htay;

///

23

3.      This case now proceed only against defendant Dr. Varanasi on Plaintiff's § 1983 claims for inadequate medical care in violation of the Eighth Amendment;

4.      The Clerk of Court be directed to reflect Defendants Dr. Ramos's and Dr. Htay's dismissal from this case on the court's docket; and

5.      This case be referred back to the Magistrate Judge for further proceedings, if any.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within fourteen (14) days** from the date of service of these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten **(10) days** after the date the objections are filed. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson, 772 F.3d at 838-39 (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **May 24, 2021**            **/s/ Gary S. Austin**
                                          UNITED STATES MAGISTRATE JUDGE